**COLLENGER v. UNITED STATES, and six other cases.**

Nos. 4353, 4395–4400.

Circuit Court of Appeals, Seventh Circuit.

May 27, 1931.

Rehearing Denied July 8, 1931.

James J. Clark and William J. McAleer, both of Hammond, Ind. (McAleer, Dorsey, Clark & Travis, of Hammond, Ind., of counsel), for appellants Collenger and Antonean.

Sims, Godman, Stransky & Brewer and Tinsman & Blocki, all of Chicago, Ill. (Elwood G. Goodman, Gale Blocki, and Harry E. Heeren, all of Chicago, Ill., of counsel), for appellants Hale and Regan.

George Norman Murdock, of Chicago, Ill., for appellant Zarkovich.

C. B. Tinkham and Timothy P. Galvin, both of Hammond, Ind. (Richard P. Tinkham, Edmond J. Leeney, and Tinkham & Galvin, all of Hammond, Ind., of counsel), for appellants Hale, Regan, Zarkovich, Ramey, and D'Angelo.

Oliver M. Loomis and George L. Rulison, both of South Bend, Ind., and William B. Duff, of LaGrange, Ind., for the United States.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Of forty-six named in the indictment as "conspirators," forty-one were indicted, twenty-three of whom were tried together. As to four of these, the court directed acquittal, and the jury acquitted four. The other fifteen were found guilty, and sentenced to serve various terms of imprisonment and to pay fines. Seven of the fifteen bring these appeals.

The single count of the indictment charged the alleged conspirators and others unknown with having conspired to violate the National Prohibition Act, setting forth a number of overt acts.

The appellants are Hale, mayor of East Chicago, Ind., Regan, chief of police of that city, appointed by Hale, Zarkovich and Ramey, police officers under Regan, and Collenger, D'Angelo, and Antonean, who held no official place.

The court, in passing sentence, said: "If the matter was presented in a little different manner with reference to possibly one or two defendants there might be a different question involved. I do not feel that I am called upon in this case to discharge Philip Collenger (counsel seem to agree that the second person to whom the court referred was D'Angelo), and I am not urged to grant a new trial— * * * not even asked to. * * * I am saying if I were asked to grant him a new trial it would be a different question for me to decide, but I am only asked to grant him a stay, or an arrest of judgment, which discharges him, and I do not feel that he ought to be discharged. He might be entitled to another trial before another jury. If he wants it, now is the time for him to ask for it."

Collenger and D'Angelo moved for arrest of judgment and discharge, but not for new trial. As to D'Angelo, the government in its brief says, "Appellee is not in a position to insist that the evidence is sufficient"; and, as to Collenger, the brief says, "Since there is nothing in the record to show that these statements of Chandler were made in furtherance of the object of the conspiracy, and since this was the only evidence connecting Collenger with the conspiracy, it is not insisted by appellee that the evidence is sufficient to sustain the verdict."

■ Our independent examination of the record convinces us that what the court said, directly as to Collenger and inferentially as to D'Angelo, and what counsel for the government stated in its brief concerning the evidence against them, is well justified, and that the evidence was not sufficient to sustain the verdict against them. They now insist that they be ordered discharged because a verdict for their acquittal should have been directed by the court, and that, had this been done, they could not again be tried on the same charge. The government, while not opposing reversal of the judgments against them, insists that this court has no right to discharge them, but only to remand their cases for another trial, and cites Slocum v. New York Life Ins. Co., 228 U. S. 364, 33 S. Ct. 523, 57 L. Ed. 879. This decision sustains the government's contention, and binds us, in case of reversal, to direct a new trial. A different rule has been applied where jury has been waived. Routzahn v. Mason, 13 F. (2d) 702 (C. C. A. 6); International Harvester Co. v. National Surety Co., 44 F.(2d) 746 (C. C. A. 7). And so, on reversal of the judgment against D'Angelo and Collenger, remandment for new trial must follow, regardless of whether motion for new trial was interposed. The error alleged, and sustained by the record, is the denial of these appellants' motion for a directed verdict. Motion for new trial is not essential to avail of this error. Even had there been such motion, it is well settled that error may not be assigned upon the court's ruling thereon. Hume v. Bowie, 148 U. S. 245, 13 S. Ct. 582, 37 L. Ed. 438; Arkansas Valley Land & Cattle Co. v. Mann, 130 U. S. 69, 9 S. Ct. 458, 32 L. Ed. 854.

■ Respecting appellant Antonean, our search of the record fails to reveal competent evidence of his guilt any more than in the case of Collenger and D'Angelo. The government's brief fairly states that "the two witnesses upon whose testimony the verdict against Antonean depends were Pappas and Komeroski." Pappas testified: "I live at Indiana Harbor. I have visited the Balkan Hotel many times. It is way down below on Guthrie Street. John Antonean runs that place. He is right here in the court room. It has got 6 or 7 rooms upstairs and a bar downstairs. Nothing else. John Antonean runs it. There is a bar downstairs and girls upstairs, sporting place. I bought intoxicating liquor there plenty of times from John, the defendant there. It was whiskey and moonshine. He has got different kinds of whiskey. I forget how many times I visited that place since 1928. I spent plenty of money. I have been there since 1919. If I have money to spend, I drop in there. It has been the same kind of place since that date."

This sufficiently shows that Antonean was running a place where he unlawfully sold whisky in one part and conducted a house of prostitution in another, but does not of itself show conspiracy.

Komeroski testified he was a physician, and that for some months prior to late January, 1928, he called about once a week at the Balkan Hotel to examine the girls there. Questioned as to a conversation with Antonean at the Balkan Hotel he said: "I had a

conversation with him at that time, in the later part of January, 1928. I came on that day and I was told by a man they called 'John' (I didn't know his last name at that time) that I couldn't examine the girls. I know now his last name was John Antonean. I told him I didn't know why I couldn't, because I used to examine them every week and I knew the girls were there, and he told me that he had nothing to do about that, he was merely working there. I said 'That seems funny, you had me come here before,' and he said, 'Well, it is being taken care of by the police department,' and that he had nothing to do with it, and he was just working there. He mentioned the Chief being in charge of it. That is all he said and I left the place. It was not John Antonean who called me there at that time."

■ The only part of Komeroski's testimony that even hints at conspiracy is that Antonean told him, in effect, that the examination of the girls was being taken care of by the police department, that the chief was in charge of it. This might tend to indicate that there was a conspiracy between Antonean and the police department respecting the conduct of the house of prostitution, although even the conclusion of conspiracy respecting this field of endeavor may be questionable. It is common knowledge that such examinations are sometimes required to be made in the interest of public health, and there is no further evidence in the record to indicate that there was any corrupt agreement or understanding between the chief and Antonean on even this subject. Besides, the keeping of bawdy houses is not a federal offense, and a corrupt conspiracy with reference to it would not be indictable in a federal court.

While, as we stated in Allen et al. v. United States, 4 F.(2d) 688, there is more or less of practical relation between prostitution and drinking, yet, where the only evidence against an alleged conspirator to violate the liquor law is that he kept a place where liquor was sold, and that he admitted having some sort of an arrangement with the "police" or the "chief" with respect to the periodical physical examination of girls engaged in prostitution in a portion of his place, we are of the belief that the proof lacks the essential element of establishing the particular conspiracy charged, and that therefore the evidence against Antonean is insufficient to sustain the verdict in his case.

As to the other appellants it is not seriously contended that the record is so far wanting in evidence of their guilt as to have required direction by the court of a verdict in their favor. But various errors are assigned which it is contended necessitate reversal of the judgments against them.

Error is assigned on the admission in evidence of statements of different ones of the alleged conspirators to government agents who testified thereto, and the failure of the court to limit such evidence to the particular defendants who made the statements. Special Agent Lease testified for the government that shortly before the indictment was returned defendant Orta signed a statement offered in evidence. The statement is in the form of an affidavit, setting forth that Orta had for three years been proprietor of a place in Indiana Harbor; that in July, 1928, he accompanied Mendez, an alleged conspirator named but not indicted, to his place of business, where Orta was then told that he (Orta) would be required to purchase his liquor from Mendez, and that it would cost $100 for protection from the police; that he paid Mendez $100 cash, and afterwards $50, and for several months bought liquor from Mendez, but, on discontinuing such purchases, was arrested by the police.

Upon offering this statement in evidence it was objected that it was incompetent as to any defendant except Orta. The court ruled that it would be admitted, and the jury was instructed not to consider it as evidence against any other defendant unless they found that the statement was made at a time when the conspiracy existed as charged in the indictment, and at a time when the defendant making the statement was one of the conspirators. It was then further charged that, in order to be admissible against the others, it would have to appear that it was made in furtherance of the conspiracy. The court said: "That might be the law. I am not clear on that. * * * I will give that instruction now. I may change it if I find it is not the law. I will accept your suggestion. Let that instruction go to the jury also. With that instruction the exhibit may be admitted and read to the jury."

The exhibit was then read to the jury, and thereupon counsel for defendants stated to the court that it then appeared the statement was but a narration of past events, and moved that the court then instruct the jury that it was no evidence against any defendant except Orta. The court said: "The request is denied." Exception was taken by defendants.

It is elementary that a statement of a conspirator, in order to bind the coconspirator, must be a statement not made in the formation of the conspiracy, but after the conspiracy is formed, and in furtherance of its objects. It is then admissible against all upon the theory that each then speaks and acts for all, if speaking or acting in furtherance of the objects of the conspiracy. It is too plain for discussion that this statement to the government agent, far from furthering the conspiracy, was made after the conspiracy had ended, and with the purpose of exposing it and penalizing the conspirators, and was hearsay as to all the defendants except Orta. When, therefore, the statement had been received in evidence, and the court's attention was then called to it by the motion to limit, it was the duty of the court then and there unequivocally to limit its application strictly to the defendant who made the statement. Where there are many defendants on trial charged with a general conspiracy, each is subjected to the hazard of being injuriously affected by alleged acts or statements of some other defendants, incompetent as to all but the ones making the statements. In such situations courts should be ever alert to minimize, so far as possible, the hazard to defendants whom the law does not bind by such statements.

When this statement appeared in evidence—inadmissible as to all defendants except Orta, and so pregnant with harm to others on trial—on the motion then made to exclude it as to the others, the duty so to limit its application was immediate and unmistakable. The statement was peculiarly harmful to those defendants who were connected with the police force—the mayor, chief, and Officers Zarkovich and Ramey. It recites the payment of money for police protection, and indicated a conspiracy which had manifested itself by the arrest of Orta as soon as he stopped buying liquor of Mendez.

A similar question arises as to the testimony of federal agents who identified a statement to them of defendant Grice Chandler, purporting to have been signed and sworn to by him August 17, 1929, in the presence of five special agents of the federal Department of Justice. After the court had deleted certain parts of the statement, the rest of it was offered and received in evidence. The statement is, in substance, that, since coming to Indiana Harbor, Chandler had been involved in maintaining gambling houses and a house of prostitution, and in selling liquor in violation of federal and state laws; that in 1926 he opened a house, paying Tom Johnson (a coconspirator, dead) $100 a day for the privilege of running it, and was told by Johnson that as long as he paid it was all right, and as soon as he quit he would be "knocked off"; that he did quit and was immediately "knocked off"; that he paid until September, 1926, when he was told to close, and did so, remaining closed until the fall of 1928; that in the interval he was in partnership with Cap White (a defendant on trial) running a crap game and selling booze, and paying $200 a week to Johnson, who promised protection; that in September, 1928, he opened another place, but before doing so he had to see Collenger, "who had taken Johnson's place as collector"; that Collenger said if Chandler paid him $250 a week it would insure protection against raids by local police; that just before the November, 1928, election Collenger and Chandler had a disagreement over the amount to be paid, and Chandler told him that he (Collenger) had been "starving me and my wife too long."

The government freely admits that Chandler's statement was not made in furtherance of the conspiracy. It reflected severely upon the members of the police department.

The government contends that, if there was right at that time to have the jury instructed as requested, the right was waived through the colloquy.[1]

[1] Court: Well, I think I should instruct the jury that unless they find that at this time there existed a conspiracy, then these paragraphs are not to be considered by the jury as any evidence against any of the other defendants except Chandler.
Mr. Galvin: We will appreciate the court going that far, but I wish to say further than that, I wish to ask the court to make his instruction go farther and say that in no event is that to be considered as any evidence against anybody except Chandler, for the reason that this is, as stated in the general objection, merely a recital of a narration of past events made by Chandler and it is not any declaration made in furtherance of the conspiracy that can be considered against the coconspirators who are on trial.
The Court: That request will be refused.
Mr. Galvin: Exception. And I take it there is an overruling of all the other objections and exceptions by all defendants.
The Court: Yes. Now, gentlemen, this modified exhibit will be admitted in evidence as modified, and I think I will take care of the limitations in my instructions rather than attempt to do it before it is read, if counsel will call that to my attention when we come to get ready for instructions.
Mr. Galvin: You mean an instruction immediately after it is read?
The Court: No, I mean in my general instructions to the jury.
Mr. Galvin: Oh, I see.
The Court: I will have to rely on counsel to a certain extent to remind me what paragraphs the instructions should apply to. I suppose counsel for the defendants will ask that they apply to all of them. Are you ready for the jury.

The right to have such incompetent and harmful evidence promptly excluded, as against those to whom it has no proper application, is plain; but, if it be assumed that the right in this instance was waived by the failure of counsel to call attention to it upon the general charge to the jury, the waiver is not applicable to the Orta statement, nor to other similar items of evidence admitted over objection, or retained through denial of motions to exclude made immediately after they were received.

Government Agent Turrou, who testified he was present when Chandler made the statement, related a conversation with Chandler in the Chicago Federal building on the same date, which was very much to the same effect as the Chandler statement. At the conclusion of his testimony it was moved by all the defendants except Chandler that the jury be instructed to consider Turrou's evidence as against no other defendant than Chandler, for the reason that it appears what Chandler said was a narration of past events, and not a declaration in furtherance of the conspiracy, and not made in the presence of any other of the defendants. This motion the court denied, and exception was taken.

Government witness and agent Lyle testified to very much the same effect, and the motion on the part of the other defendants to strike it as to them because not made in their presence nor in furtherance of the conspiracy was denied by the court.

A written statement of defendant Overall, made to Government agents nearly three months after the return of the indictment, was to the effect that in 1925 Overall had a talk with defendant Hale, when the latter was candidate for mayor, in which Hale said that he would take care of Overall and Chandler for four years if they would support him; that Overall could have Broadway, Chandler Parish avenue, and Cap White Pennsylvania avenue; that later a man told Overall he could get him police protection; but that, after he (Overall) refused to pay, he was raided by the police department, although before that he had not been raided.

■ The court denied motion of the defendants other than Overall to exclude the statement as evidence against them. Manifestly this statement also had no possible relation to the conspiracy, and was hearsay as to the defendants making the motion to exclude. The statement was severely harmful to Hale, and reflected strongly upon the other defendants connected with the police depart-

ment. As to all of them it should have been excluded, with such admonition to the jury as would tend to minimize its harmful influence upon those defendants against whom it afforded no degree of competent evidence.

■ It is contended for the government that whatever of error there may have been in the admission in evidence of the statements and testimony of conversations, or the failure to limit their application, was obviated or cured by that part of the court's general charge at the close of all the evidence, which was: "I instruct the jury that the statements of coconspirators are admissible if made during the conspiracy and in furtherance of the object of the conspiracy and are admissible as against all persons who are in the conspiracy, but that these statements are not to be used for the purpose of establishing the existence of the conspiracy itself."

This charge, in effect, put it up to the jury to decide whether the statements and evidence were admissible against the complaining defendants. This was a function of the court, not of the jury. The statements and conversations were but narratives of past events, in no respect attributable to the conspiracy. They were purely hearsay, and inadmissible as to all the defendants save those who made them. It was for the court to pass upon their admissibility, and indeed it did so pass—in overruling objections to their admissibility against the objecting defendants or in denying motions, made after they were received in evidence, to so limit their application. These rulings closed the matter so far as the objecting defendants were concerned, and they were not thereafter required to seek further ruling by the court in order to avail of any error in the rulings thereon already made. As we have above suggested, such evidence should on objection or motion have been rejected or stricken out as to the other defendants, when it was evident that it was but hearsay. That was the least the court could have done to protect defendants against whom the statements and evidence were not competent from the serious menace of their influence. The charge given is the statement of a mere abstract principle of law which the jury was quite unqualified to apply to the many defendants and to the many instances of the reception of such evidence in the course of this lengthy trial.

Had the charge specifically pointed out that this or that statement received in evidence, or this or that evidence of what a giv-

en defendant had related to the witness, was incompetent and not to be used against specifically named defendants, it might perhaps have served sufficiently to have neutralized the virus of the improper admission or refusing to strike. This we need not decide, since the charge given did not serve to guide the jury as to what evidence should be rejected.

The failure to exclude or limit this evidence may indeed account for Collenger's conviction, apparently upon such a statement alone, concededly incompetent as to him. If such incompetent evidence served to convict him, the mass of evidence of the same kind, improperly received as to other of the defendants, in all probability tended materially to influence the result as to them.

The government's contention that the statements and evidence were admissible as res gestæ is altogether too far-fetched and groundless to merit discussion.

██ Another contention of error arises respecting witness Burhop, who was a nephew of Hale's wife, and who gave testimony for the government exceedingly damaging to Hale, and in somewhat lesser degree to Regan and Zarkovich. He was for a time on the police force, and held other city positions during Hale's mayoralty, and was one of the alleged conspirators, but not indicted. On cross-examination some impeaching questions were put to him respecting a conversation between Hale and himself in the presence of Phillips, another uncle. The conversation inquired about was developed in a number of questions, which, with Burhop's answers thereto, appear in the margin.[2]

No objection to these questions was interposed when they were asked of Burhop, but, when Hale and Phillips were interrogated as to whether the conversation occurred, the government objected on the ground that the conversation was as to collateral matters, and that the defendants were bound by the answers, and that the questions were largely self-serving as to Hale. The court sustained the objection, and Hale and Phillips were not permitted to testify on that subject.

The government's position thereon may be summarized in these words from its supplemental brief: "It may be admitted that a portion of the offer (though a minor portion) would have been admissible under the rule contended for by appellants if it had been offered separately. But no such offer was made. The admissible portion of the conversation was so commingled with the inadmissible portion that the court was justified in denying the entire conversation."

There can be no question but that it was competent to undertake impeachment of Burhop by showing his bias or hostility toward Hale or other defendants, and his manifested readiness, for a consideration, to testify for or against them. Murray v. United States, 247 F. 874 (C. C. A. 4); Quaker Oats Co. v. Grice, 195 F. 441 (C. C. A. 2.); Hoagland v. Canfield, 160 F. 146, 170 (C. C. A. 2).

Impeaching questions cannot always be limited to the alleged words of the witness. Enough of the conversation may be inquired of to indicate fairly and intelligently the real scope of the conversation. Nashville Interurban Ry. v. Barnum, 212 F. 634 (C. C. A. 2); Fincher v. State, 58 Ala. 215; State

---

[2] Q. And in that conversation, or didn't you at that time have this conversation in substance: "You—" addressing Doctor Hale—"You were arrested wasn't you? Do you know why you were arrested?" Doctor Hale answering, "I know nothing about it except that I was arrested." You replied, "Well, damn you, if you are going to fight your case that way you are done for." Then Doctor Hale replied, "I have nothing to say about my case until I know what I am charged with." And you replied, "Well—" using a term that I will not repeat, but I will use the word "kick" instead of it—"Well, kick you, if you don't want to talk to me." His reply was, "What shall I talk about?" And you said, "I have information that can stop this whole affair. I am in bad, arrested on two counts, delinquency and the Mann act, and I am going to have to do time. Besides, my damn woman has left me and I don't give a damn what happens now. You don't need to think that anybody else can get you out of this but me. I have the inside dope and if you want it you can talk to me." Then he replied, "Well, what do you want me to do? If you have any information, give it to me." Your reply was, "I am no damn fool. I need money, having lost $85,000, and I have made plenty of money in the past two years by running booze, and now you can set me in right and let me

run, and I can give you the information." Did you have such a conversation in substance?
A. No, sir.
Q. At that time and place?
A. No, sir.
Q. You did not?
A. No, sir.
Q. Wasn't this further conversation at the same time and place had between you and Doctor Hale: "You never did like me," you addressing Doctor Hale, "You never spoke to me only when I was first on the police department." And Doctor Hale replied, "No, I never gave a policeman an order, nor have I talked to any policeman. You didn't want to talk to me. I passed you three times on the South Shore coming from Chicago when you got off at Hammond and you didn't offer to speak to me." Your reply, "Well, a fellow gets off where he can make money, and sometimes he doesn't want to be seen getting off. I wanted to get off at Hammond and I didn't want anybody to see me get off there. The last time I saw you was when you were with John Horn in that train." Did you have such a conversation in substance?
A. No, sir.
Q. Nothing like it?
A. No, sir.
Q. And did you have this further conversation at the same time and place: "Yes, when you got off

v. Malmberg, 14 N. D. 523, 105 N. W. 614; Wigmore on Evidence (1904 Ed.) § 951.

Surely the last question asked was free from any objectionable extraneous matter, and we are of the opinion that nothing seriously objectionable from the viewpoint of competency appears in the other questions.

It seems plain to us that, if the defendants injuriously affected by Burhop's testimony were entitled to adduce the proffered impeaching evidence, serious error intervened in its rejection.

The attitude of the Supreme Court upon a kindred situation is instructively indicated in the recent case of Alford v. United States, 282 U. S. 687, 51 S. Ct. 218, 75 L. Ed. 624. A defendant was convicted of a criminal charge. A witness who gave damaging testimony against him was upon cross-examination asked the question, "Where do you live?" Government's objection to the question was sustained. The Court of Appeals (with one dissent) sustained the ruling of the District Court on the ground that "the proposed question was merely in pursuit of a fishing expedition by which he [counsel] hoped to discredit the witness." 41 F.(2d) 157, 160 (C. C. A. 9). The Supreme Court, evidently deeming the situation to afford "special and important reasons" for its intervention, awarded certiorari, and, brushing aside technicalities, reversed the judgment upon the ground alone that the defendant had been unduly restricted in his lawful right of cross-examination.

In the light of this adjudication, the rejection of the impeaching testimony of Hale and Phillips was error, decidedly serious as to Hale, Regan, and Zarkovich.

For the errors pointed out applicable to the several appellants, the judgment as to each of them is reversed, and the cause as to each of them is remanded to the District Court, with direction to grant in each case a new trial.

---

at Hammond." Then he said, "Yes, when you got off at Hammond." Then you said, "Well, you can fix me up. I have tried to talk to Martin and the Chief for two days. You are mayor and somebody in the community, and I don't want to talk to anybody but you. You have a smart chief, smartest in the game, and Martin is just as smart, and if you don't want to talk to me, God damn you, you can go kick yourself. My partner and I want to know where we are going to be. You know he is my partner and I own the place." His answer was, "What place?" You gave the address, 3536 Pennsylvania. "I have got protection and you can't touch me." Did you have such a conversation in substance?

A. No, sir.

Q. Didn't you further say in this conversation, "You have ridden hell out of me for the past two years," and he replied, "You needed it. You had every opportunity to make something of yourself, and when I was elected mayor you asked me to give you a chance to work and that you would go to a dental school. I kept my promise to you and put you to work in the mechanical department, and you asked to be put in the police department. I did that. And you became so rotten in the police department I had to take you off entirely. I talked to you and warned you and even held your check so you could get your bills paid up, but you went to the bad right. You missed your very best opportunity." And your reply was, "Hell, I have had fifteen opportunities in the past two years. What the hell do I care about opportunities? I have this information from the inside, but you won't get it unless you tell me that you will take care of me, and, kick you, if you don't want it you can go to jail." And didn't he reply, "Maybe I will. But you can't ever get me in a corner, Burhop. If you want an argument I will give it to you. If you want to talk to me I will talk to you, but I will not bargain with you in any way for anything you have."

Wasn't that conversation had in substance at that time and place?

A. No, sir.

Q. And wasn't this further said: "I am sick and tired of all this stuff. Grannie is gone and there has been hell here since." He replied, "Yes, she died of a broken heart." And your reply, "I never did anything—" his reply, "I never did anything in my life that I was ashamed to go home for—" I missed one place here. "Yes, she died of a broken heart," and you said, "Yes, I know that, and if you knew what she said to me, you wouldn't go home tonight." Then his reply was, "I never did anything in my life that I was ashamed to go home for, and I think I had the last word with Grannie. You and some others are responsible for her death and all that has happened here." And didn't you reply, "Kick you, you are in bad, and, God damn you, if you don't want my information you can go to hell." His reply, "John, you are a regular bum. You have no friends. You have lost all the manhood you ever had, and you should be ashamed of yourself. And you said, "I know it. You were always good to me and I like you, but, God damn you, when they were raiding my place over there we were stealing the booze from the cellar vault in the city hall." Didn't you have that conversation in substance?

A. No, sir.

Q. Didn't you further say in the conversation, after he had told you that you should straighten up and become a man, "Who the hell wants any manhood? All I want is a chance to make a dollar and I am going to get it, and I don't care how. I lost my woman but what the hell do I care about that. I can get plenty of broads. All I want is a chance to make money and you can give it to me, but you won't talk to me about it," and didn't he reply, "No, I didn't come here to bargain with you in any way. If you have any information that you claim you have, you should be man enough to give it to me."