## INTERNATIONAL HARVESTER CO. v. NATIONAL SURETY CO.

### No. 4332.

Circuit Court of Appeals, Seventh Circuit.
June 7, 1930.

Rehearing Denied Sept. 16, 1930.

Wm. S. Elliott and J. F. Dammann, Jr., both of Chicago, Ill., for appellant.

Ralph M. Shaw and Edward W. Everett, both of Chicago, Ill., for appellee.

Before ALSCHULER, PAGE, and SPARKS, Circuit Judges.

PAGE, Circuit Judge.

Plaintiff (appellant), with thirty-two plants in cities of the United States and Canada, fourteen of which were in the city of Chicago, carrying a policy issued by defendant (appellee) for protection against loss at any of the plants by robbery of money intended for pay rolls, sued defendant for such a loss, and, after jury waiver in writing and trial by the court, judgment was rendered for defendant.

Defendant introduced no evidence. The so-called coverage clause reads as follows: "For direct loss by robbery of money, intended for payrolls only, from the care or custody of any employe of the assured, while acting as messenger or paymaster, and while receiving, handling, conveying and distributing the same, to and from and within such place or places as may be directed by the assured, and described in Statement No. 3 of the Schedule."

Defendant's claim is that the money was not taken (1) from anybody's care or custody; (2) from any employee while acting as messenger or paymaster; (3) from such employee while he was receiving, handling, conveying, or distributing the same.

The plat below (see p. 747) shows a part of the plaintiff's Chicago tractor plant office, the place of the robbery.

The pay roll in question, some $80,000, was made up at plaintiff's main office on Michigan avenue, Chicago, placed in a chest, and carried by Brink's Express Company, to the tractor works office, six miles away, arriving there between 11:20 and 11:40. The chest was placed at 6 in the conference room 5. The conference room door was locked, and Johnson, who receipted for the money, Lutz, the superintendent, Daily, the auditor,

1. Truck entrance.
2. Armed guard.
3. Front entrance.
4. Armed guard.

5. Conference room.
6. Money chest.
7. Asst. Supt. office.
8. Supt. Lutz's office.

9. Lutz's desk.
10. Doorway Lutz's office.
11. Where guard "4" was when he shot at robbers.
$a, b, c, d, e, f$. Course taken by robbers.

Waring, the assistant superintendent, and Wrath, the paymaster, each had a key. There were about fifteen employees in the office, and during the robbery most of them were against the walls with their hands up, or face downward on the floor.

The walls of the rooms here in question were of clear glass, above a three-foot wainscoting. Lutz, at 9, from his room 8 could see through the assistant superintendent's room 7 into the conference room 5. He knew when Brink's men took the chest to the conference room.

Two outside entrances, 1 and 3, are shown on the plat. When the money was delivered, and also at the time the robbers came, shortly thereafter, there was an armed guard at 2 and another at 4. There were nine armed robbers. They disarmed the guard at 2, and at the point of a gun backed into a rear room the guard at 4. That guard reached the stairway at 11, and from there did some shooting at the robbers. Another employee, with a gun pointed at his side, told the robbers where they could find the money. The robbers entered at 3 and the line "a" to "f" shows the course taken by them. After some little delay, the door was broken down, and the chest taken away.

Usually the money reached the tractor works shortly before noon, and it was the practice of Wrath, designated as paymaster by Lutz's predecessor and continued by Lutz, to eat his lunch at the company's restaurant early and return to the office about 12 o'clock. With several others assisting him, he then checked the money against the pay roll and made necessary additions and corrections. That work took an hour or more. The money was then placed in proper order upon trays, carried into the factory by Wrath and others, accompanied by guards, and given to the workmen, immediately after they had commenced work following the noon hour.

In many pages of its brief, defendant argues that there is before us a question of fact. We are of the opinion, that the only question before us is one of law.

■ It is claimed that, because of failure to call the auditor and other employees, there arises, as against plaintiff, the presumption that they might have testified adversely to plaintiff's interests. As one of the reasons why the auditor should have been called, it is pointed out that Lutz testified to an agreement between him and the auditor that both should be there during Wrath's absence, and that, if the auditor had been called, he might have contradicted Lutz. Defendant seems to have overlooked the fact that that testimony

was stricken out on its motion. We do not find any suspicious or unexplained circumstances that would raise a presumption against plaintiff by reason of its failure to call as witnesses the employees named, and we think this case does not fall within the rule laid down in Kirby v. Tallmadge, 160 U. S. 379, 383, 16 S. Ct. 349, 40 L. Ed. 463.

After many intimations and assertions in defendant's brief that there was negligence on the part of plaintiff, counsel concedes that negligence is not a defense under the policy. ■ In determining defendant's obligations under the policy, we must examine all its provisions and take into consideration also the purposes of the contract, the acts necessary to be done in handling the pay roll money, and the conditions surrounding that handling.

■ The chest remained in the locked conference room for some minutes before the robbery. Although there were perhaps half a dozen persons, including Lutz, within 20 or 30 feet of the door of the conference room, no one was in the room with the chest. From that fact, defendant concludes that there was no coverage, because it says: (a) The words "receiving, handling, conveying and distributing" denote some physical act, and that while the money was at rest the situation was not within the meaning of any of those words; (b) the money was not within the actual care and custody of any one.

The coverage clause, relating to conveying the money, says "to and from and within such place or places as may be directed by the assured." That language seems to be broad enough to permit of the conveyance of all the pay rolls to all of the plants from the Chicago office. How much time was required in any case to convey the money to the place of disbursement does not appear. Whether defendant knew the conditions under which the money had to be transported from one place to another does not appear, but it does appear that plaintiff was left to its own devices as to the time and manner of transporting money, except that it should be between given hours. Whatever conditions, by way of hinderances, delays, etc., plaintiff encountered in any given case, or might encounter in any case, the defendant knew plaintiff must accept as it found them. While it does not appear that Brink's Express left the main office at the same hour on each pay day, yet it does appear that there were variations in the time of arrival at the tractor works of from ten to twenty minutes. Considering the ordinary commonly known exigencies of travel through the streets of a large city, it is

hardly possible that stops for one reason and another, of greater or less duration, would not occur. It was to be expected that the money would, at times, be at rest.

On oral argument, counsel for defendant was asked, "If the money had been placed in the safe, would there have been a coverage?" and the answer was "No." Special agreement H–3 of the policy reads: "Location where money is paid to the employes and the number of guards accompanying each paymaster at each location and kind of conveyances used and other form of protection are as follows:"

Under the heading "Other Protection," opposite the names of two of the plants, appears the words "Safe." It must be presumed that it was intended that, where there was a safe, the money might be placed in it for protection. Money in the safe would be at rest.

■ While the term "paymaster" is frequently used, we think it important to note the provisions of the policy, and also the absence of other provisions. In the coverage clause, the reference there is not to a person who has been designated as paymaster, but is to "any employe of the assured, while *acting as* messenger or paymaster." (Italics ours.) Special agreement H(4) reads: "Number of paymasters not to exceed thirty-two (32) but there may be as many assistant paymasters as are required and the personnel of the paymaster at any place or any of his assistants is entirely eliminated."

That provision says that all questions as to who or what the paymaster or any assistant is are wholly eliminated, and seems to explain the absence from the policy of any requirement as to the name of the paymaster, what qualifications he should have, or how he should be appointed.

One paragraph in the policy provides: "In consideration of the premium charged, it is hereby understood and agreed that Brink's Express Company may, at the option of the assured, pay off employes of the assured, and while so doing will be considered as employes of the assured and covered as such under this policy, anything in the policy to the contrary notwithstanding."

Here is a provision that Brink may pay off, and that, while so doing, shall be considered, not as paymaster, but as employees of plaintiff—no reference is made to a "paymaster."

We are of opinion that it was not the purpose nor the intention of defendant, in drafting the provisions of the policy, to limit the handling of the money to some individual who may have been designated as paymaster, but that there would be a coverage even though such designated paymaster personally had nothing to do with receiving, handling, conveying and distributing the money. It could not have been intended that, if the individual designated as paymaster had been sick, on vacation, or was for any other reason not present on the day fixed for paying the wages of the men, that a payment made upon that day would not have been covered by the policy. If that was the intention, why the special agreement H (4), quoted above? The evidence shows that the superintendent, who had the power of appointment, designated himself to remain there and look after the pay roll during the absence of the paymaster.

It is urged that the superintendent did nothing with the money, but went ahead about his business in his own room, with his back to the room where the money was placed, and that he did not know when the auditor went in to check the seals. But it does appear that he knew when the robbers came and was alert to act; that he went to the door of his room, 10, ascertained that there was a holdup; that, while he was there, shots that struck the floor threw splinters into his face; that he then returned to his desk to get his revolver, but concluded that it was useless to try to do anything, as he was covered by the guns of the robbers.

The guards at 2 and 4 were armed and placed at those points because it was pay day and for the express purpose of protecting the pay roll money. The money was thus placed under their care and control, to protect it from all persons approaching it with felonious intent. Those men were armed and placed on that day for the sole purpose of protecting the money, and they were the first obstacles encountered by the robbers, and were disposed of by violent assaults upon them. Those men were assistants to the paymaster.

■ Defendant contends that "handling," as used in the policy, means that there must be some physical touch by which something is done with the property; that is, that it must be going through some movement or manipulation, and that while property is at rest it is not being handled. We think the word, as used, must be given a broader meaning.

One of the riders on the policy contains the following provision:

"In consideration of $5.50 additional premium, it is understood and agreed that insurance in the amount of $4,000.00 is added to the policy of which this endorsement is attached to apply and cover payroll money

while being handled by the Paymaster at the following location: $4,000.00. Tractor Works; Construction Roll, Chicago, Illinois. 2 Guards—Private Conveyance. Hours 7 A. M. to 7 P. M.

"This endorsement is effective from the 24th day of July, 1925."

That provision covers all conditions necessary to bring that money within the protection of the policy. The word "handled" only is used, and it covers every step to be taken in connection with the money intended for a pay roll. The following are among the definitions of the word "handle" found in the dictionaries:

"To manage, conduct, direct, control: (a) a thing, animal or person; (b) a matter, course of action, etc. (sometimes: carry out, perform, transact). 4. To use, do something with; to make due use of; to deal with, treat; to have in hand or pass through one's hands in the way of business; to trade or deal in; to buy and sell." Oxford.

"To manage, contrive, or direct with or as with the hands; use, ply, wield, manipulate; as to handle a musket or an oar; 'Grant * * * had been raised to the chief command of a vaster army than has ever been handled by any mortal man;' to act toward; deal with, treat, as 'They handled him shamefully;' to buy and sell; trade, invest, or deal in, as to handle cotton or wheat; to handle stocks and bonds." Standard.

"To use for a specified purpose; to manage, control, direct, as 'He handled his regiment finely;' 'He is a boy who is hard to handle.' To deal with, to act upon, to perform some function with regard to, as, 'Much mail matter was handled.'" Webster.

"To deal with, to manage." Soule's Dictionary of Synonyms.

It thus appears that "handling" covers many acts that do not involve in them any idea of physical contact, and that it covers acts that relate to matters that have no physical existence at all. It is quite common to say, for instance, that a lawsuit is "handled" by A, that the matter of financing a concern is "handled" by B, or that the sale or purchase of a property is being "handled" by C. We are of opinion that the word "handling," as used in the policy, is broad and comprehensive enough to cover the money intended for the pay roll from the time it was separated for that purpose until received by the employees.

We are of opinion that the money intended for pay roll was, at the time of the robbery, covered by the policy.

The judgment is reversed and the cause is remanded, with direction to the District Court to enter judgment for the plaintiff in the action for the sum of $80,421.47, with interest thereon at the rate of 5 per cent. per annum from March 20, 1926, to the date of entry of the judgment, together with the costs of suit.