LIBERTY MUTUAL INSURANCE COM-
PANY, a Massachusetts corpora-
tion, Plaintiff,

v.

HERCULES POWDER COMPANY, a
Delaware corporation,
Defendant.

Civ. A. No. 1537.

United States District Court,
D. Delaware.

Nov. 17, 1954.

William Prickett, Wilmington, Del., for plaintiff.

Thomas R. Hunt and Robert A. Fulwiler, Jr., Wilmington, Del., for defendant.

Leonard G. Hagner, U. S. Atty., Wilmington, Del., for the United States.

RODNEY, District Judge.

This is an action for a declaratory judgment brought by Liberty Mutual Insurance Company (hereinafter referred to as Liberty), a Massachusetts corporation, against Hercules Powder Company (hereinafter referred to as Hercules), a Delaware corporation, to have determined Liberty's rights and responsibilities under a liability insurance policy issued by it to Hercules. That such questions will support a declaratory judgment proceeding appears to be well settled.[1] The matter is now before the court on motions by both parties for summary judgment based on the complaint, answer, stipulation and plaintiff's affidavit. Subsequent to oral argument a second stipulation was filed with leave of the court, withdrawing and cancelling the earlier stipulation and permitting the amendment of certain paragraphs of the complaint and answer. Said stipulation also provided that no issue as to any material fact was raised by the complaint and the answer as amended.

Briefly stated, these are the facts. Hercules and the United States had entered into a contract sometime prior to 1945 under the terms of which Hercules was engaged in experimental research for the Department of the Navy at the Alleghany Ballistics Laboratory of Hercules at Pinto, West Virginia. Pursuant to the contract, title to all materials purchased for the Navy by Hercules to be used in its research at the Pinto Laboratory vested and remained in the United States. In the latter part of 1952 Hercules purchased an aluminum tube from the Aluminum Company of America. Upon receipt of the tube at Pinto, Hercules squared its ends and welded a plug in each end. The tube was then placed or plunged into a mass of liquid or molten explosive material. After this material had cooled and coagulated, the tube was removed therefrom. This process was repeated many times, thereby leaving in the solidified explosive mass numerous holes corresponding to the outer dimensions of the tube. The tube was then washed or in other ways decontaminated so as to remove any of the explosive material from its surface.

Thereafter, Hercules sent the tube to the Electro-Chemical Engineering and Manufacturing Company to have work done on it by the latter at its plant in Emmaus, Pennsylvania. The work consisted of applying a coating to the tube, after which heat was to be applied to cure the coating. The tube was to be re-

1. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617; Maryland Casualty Co. v. Consumers Finance Service, 3 Cir., 101 F.2d 514. See also exhaustive annotation of cases in 142 A.L.R. 67.

turned to Hercules upon the completion of this work by Electro-Chemical. While the tube was being baked, it exploded, resulting in the death of one Althouse, injury to one Fegeley, both employees of Electro-Chemical, and damage to Electro-Chemical's premises.

Suit has been brought against Hercules in the District Court for the Eastern District of Pennsylvania by the administratrix of Althouse and Maryland Casualty Company, the compensation carrier of Electro-Chemical. No decision in this case has come to my attention, and presumably the matter is still pending.

In December, 1945, Liberty issued a policy of insurance to Hercules insuring the latter against certain risks incident to its experimental research work under its contract with the Government. The policy was still in force at the time the tube exploded in November, 1952.

Hercules has asserted that its liability, if any, in the Althouse suit is within the coverage of its policy with Liberty. Accordingly, it has demanded that Liberty defend that suit and, if necessary, indemnify Hercules to the extent of the limits of the policy.

Liberty has denied that Hercules' liability, if any, in the Althouse suit is within the coverage of the policy, and has therefore disclaimed any obligation on its part to defend that suit or to indemnify Hercules for any judgment which may be rendered against it.

The policy in issue is captioned "Comprehensive General Liability Policy," and is conceded to be a standard form of liability policy. Its constituent parts are the "Insuring Agreements," "Exclusions" and "Conditions" and, of course, all of these must be considered together in order to completely ascertain the policy's terms. Some fifteen endorsements have been appended to and made a part of the policy, but only one, the general endorsement, has material relevancy to the issue now before the court. The pertinent part of this endorsement, around which centers the main contentions of the parties, is hereinafter set out.

Liberty contends that the overriding purpose of the policy was to protect Hercules from liability for accidents occurring in its operations at the Alleghany Ballistics Laboratory, and there only. In other words, Liberty contends that the policy provided coverage, with certain obvious exceptions, for premises operations accidents only. Liberty points out that in Item four of the "Declarations" Hercules had listed under the heading, "Locations of all premises owned, rented or controlled by named insured" the "Alleghany Ballistics Laboratory, Contract Nord 9709, Pinto, West Virginia." Therefore, Liberty argues, the fact that the accident occurred in Emmaus, Pennsylvania clearly shows it to be without the coverage. Liberty also argues that the products liability exclusion contained in the general endorsement relieves it from any obligations in this matter.

Hercules counters these arguments of Liberty by contending that the overriding purpose of the policy was to protect Hercules from liability resulting from accidents arising from its operations under the Nord contract wherever such accidents occur. In addition, Hercules contends that the exception in the products liability exclusion referred to above brings the accident at Emmaus within the coverage of the policy and obligates Liberty to defend the action and, if necessary, to indemnify. Finally, Hercules relies upon the time-honored principle that any ambiguities in an insurance policy must be so construed so as to effectuate coverage and defeat exclusions.

With respect to the last-mentioned contention of Hercules, there is a long line of decisions existing in practically all jurisdictions holding that inasmuch as the insurance contract is couched in words of the insurer's choice, any reasonable doubt as to their meaning should be resolved in favor of the insured. The Delaware courts are in accord with this general principle of construction. See Laird v. Employers Liability Assur. Corp., 2 Terry 216, 41 Del. 216, 18 A.2d 861, 864, (Super.) and cases therein cited. However, this canon of construction is

not to be arbitrarily applied and is not called into play in construing those contracts, including contracts of insurance, which are free from ambiguity or those which can be resolved by ascribing to their terms the "ordinary and usual understanding of their signification." It is not the purpose of courts under the guise of construction to read ambiguity into a contract by "forcing from plain words unusual and unnatural meanings."[2] As was said in Laird v. Employers Liability Assur. Corp., supra, "Courts, we think, should guard against the temptation to hold indemnitors to obligations not fairly within the terms of their engagements."

In the view herein taken of the matter now before me, I deem it unnecessary to resolve it on the ambiguity issue, despite the fact the parties vigorously disagree not only over the meaning or construction of clauses of the contract but also over individual words as well.

■ The defendant contends, generally, that the insurance policy covered the defendant with reference to the "Nord-9709" contract with the United States, and this regardless of where the injury occurred. This contention is, at least partly, based upon § 2 of the General Endorsement, reading as follows:

"Such insurance as is afforded by the policy applies to all operations in connection with the contract designated in paragraph 1 of this endorsement [Nord Contract-9709] and all sub-contracts thereunder and does not apply to any other operations of the insured."

I am of the opinion that the purpose of this provision is not to give an extra-territorial effect to the coverage, but rather to limit the coverage to matters relevant to the stipulated Nord contract and to exclude matters which are not relevant to or connected with the Nord contract, whether said matters occurred at the West Virginia plant or elsewhere.

The quotation from § 2 of the general endorsement is not the only pertinent provision of the policy which must be given attention. At the very inception of the policy Liberty agrees with the insured " * * * subject to the limits of liability, exclusions, conditions and other terms of the policy."

The term "exclusions" by or of which the liability of Liberty is subject leads directly to the general endorsement and especially § 8 of this endorsement, about which clusters most of the difficulties of the case with reference to the coverage of the policy as to an accident happening away from the plant at Pinto, West Virginia, and happening at Emmaus, Pennsylvania.

Paragraph 8 of the general endorsement reads as follows:

"This policy does not apply:

"(a) To the handling or use of, the existence of any condition in or a warranty of goods or products manufactured, sold, handled or distributed by the named insured, other than equipment rented to or located for use of others but not sold, if the accident occurs after the insured has relinquished possession thereof to others and away from premises owned, rented or controlled by the insured or on premises for which the classification is stated in the declarations as subject to this exclusion."

■ The construction and meaning of the paragraph can best be ascertained by a critical examination of its component parts about which there is controversy. This may lead to some repetition and prolixity, but most of the controversy centers on this paragraph. The first words whose meanings are in dispute are the words "handling" and "handled." The plaintiff, Liberty, contends that the words are both to be accorded their ordinary meaning of "manipulation" or physical use. Hercules concedes that the

2. Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 52 S.Ct. 230, 76 L.Ed. 416;

Holtz v. New York Life Ins. Co., 7 W.W. Harr. 1, 37 Del. 1, 179 A. 497.

first word "handling" applying to the activities of some third party should be accorded the ordinary meaning of "manipulation" or physical use, but that the word "handled" as applicable to the activity of Hercules is to be given a commercial sense as "of dealing in." Hercules concedes that if inappropriate words be deleted leaving the phrase to read, "The policy does not apply to the handling * * * of goods or products * * * handled by the insured," then the two words would be given the same meaning. It contends, however, that in considering the entire paragraph the word "handled" should be given merely a commercial sense, and since the tube was not commercially used by Hercules, therefore the exclusion does not apply.

■ The two quoted words were precisely considered in Employers Mutual Liability Ins. Co. v. Underwriters at Lloyd's, D.C., 80 F.Supp. 353, affirmed 7 Cir., 177 F.2d 249. There the situation was the reverse of the present and the insurer claimed that "handling" was used in a commercial sense. The court held otherwise and that the word was used in its ordinary signification. With this I agree.[3] The word "handle" has many meanings, but an ordinary meaning is as adopted above and words will usually be given their common or ordinary meaning. With this first meaning of "handling" as reasonably clear or conceded, it is a familiar rule that a word used in a certain sense in one part of a contract will be deemed used in the same sense in another part unless the context indicates otherwise. Jensen-Salsbery Laboratories v. O. M. Franklin Blackleg Serum Co., 10 Cir., 74 F.2d 501; Midland Valley R. Co. v. Railway Express Agency, 10 Cir., 105 F.2d 201, 203. This must be especially true when the two words are in the same sentence.

■ The next phrase of the exclusion concerns "goods or products manufactured, sold, handled or distributed by the named insured." I have considered the word "handled." Waiving the question as to whether the work done on the tube by Hercules, viz., the changing of the shape of the tube by squaring its ends and plugging it, would make the tube a "product" of Hercules, yet it seems clear that the tube would come within the term "goods * * * handled by the named insured."

■ I must now consider the exception to the exclusion clause covered by the expression "other than equipment rented to or located for use of others but not sold." Waiving the question as to whether the tube was "equipment" when in the possession of Hercules, it seems clear that when the tube was sent to Electro for one specific treatment it was not "equipment" and not sent for the "use of" Electro, but solely to have the specific work done on it. So I think the exception to the exclusion provision to the policy does not apply but that the exclusionary provision itself remains in full force.

The plaintiff, to sustain its contentions that the policy in question covers only a liability to indemnify and defend for an accident at Pinto, West Virginia and does not cover an accident at Emmaus, Pa., cites a number of cases listed in the footnote. I deem it unnecessary to review these cases at length.[4]

The defendant, to sustain its contention that the coverage of the policy embraces an accident at Emmaus, Pa., relies mainly on the following cases which

---

3. See also Doody v. National Masonic Accident Ass'n, 66 Neb. 493, 92 N.W. 613, 60 L.R.A. 424; State v. Pickett, 47 S.C. 101, 25 S.E. 46; Aetna Ins. Co. v. Railway Express Agency, 80 Ohio App. 30; 74 N.E.2d 425; International Harvester Co. v. National Surety Co., 7 Cir., 44 F.2d 746.

4. Employers Mutual Liability Ins. Co. v. Underwriters at Lloyd's, D.C., 80 F.Supp. 353, affirmed 7 Cir., 177 F.2d 249; Lyman Lumber & Coal Co. v. Travelers Ins. Co., 206 Minn. 494, 289 N.W. 40; Hultquist v. Novak, 202 Minn. 352, 278 N.W. 524; Loveman, Joseph & Loeb v. New Amsterdam Casualty Co., 233 Ala. 518, 173 So. 7.

must be examined in some detail. Reed Roller Bit Co. v. Pacific Employers Ins. Co., 5 Cir., 198 F.2d 1, certiorari denied 344 U.S. 920, 73 S.Ct. 386, 97 L.Ed. 709; Youghiogheny [Yokogani] & Ohio Coal Co. v. Employers' Liability Assurance Corp., D.C., 114 F.Supp. 472; Philadelphia Fire & Marine Ins. Co. v. City of Grandview, 42 Wash.2d 357, 255 P.2d 540.

The facts of the Reed case briefly were: That one Jones, an employee of one Patterson, was injured when an abrasive wheel manufactured by one Bay State Company and not manufactured by Reed, had disintegrated while being used on a machine manufactured by Reed. An employee of Reed had negligently represented that the Bay State wheel could be safely used on a Reed machine. Jones sued Reed and recovered. Reed paid Jones and sued Pacific, its insurer. The policy held by Reed contained two material provisions under the definitions of hazards, namely Division 1 and Division 4. Division 1 covered "Premises-Operations" and Division 4 covered "products." Premium had been paid only under Division 1. Under the "Exclusions" of the policy in paragraph D it is stated that the policy would not apply under Division 1 to liability with respect to which insurance is or can be afforded under Division 4 of the definitions of hazards. Thus there would be no coverage under Division 1, ("Premises-Operations") even though the premium was paid therefor, if coverage was or could be had under Division 4 (Products). The lower (District) Court held that the negligence and injury was not covered by the hazard insured against Division 1. The Court of Appeals [198 F.2d 3] (5th Cir.) held that Division 1 of the hazards ("Premises-Operations"), as set out in the footnote,[5] covered "all operations whether on the premises or elsewhere which are necessary or incidental to the declared use of the premises." Thus the court held the injury within the coverage of Division 1, unless excluded therefrom by paragraph D of the exclusions. The insurer argued that "completed" operations were insurable under Division 4 and therefore excluded from coverage under Division 1. The Court of Appeals viewed the alleged representations of Reed's agent to be "operations;" that the negligent representation was not completed until acted on by the person to whom it was made, and that the "hazard" was not covered by Division 4 and thus not excluded from the coverage of Division 1 of the hazards defined in the policy.

A very material distinction of the Reed case is that in the instant case there was no provision of the policy similar at all to the provision under which liability was fixed in the Reed case. In the instant case, too, the coverage did not insure against "hazards" but solely because of liability for bodily injuries caused by "accident." The distinction between "hazards" and "accidents" is more fully dealt with in the next case to be considered.

I am of the opinion that the Reed case has no close application to the pending case.

The Youghiogheny & Ohio Coal Co. case has much of interest. The Coal Company received a freight car and loaded coal upon it. The car eventually reached another point, and when it was being unloaded a person was hurt. The injured person alleged the negligent act of the coal company in failing to see that the car was properly equipped with a false door or some appliance to prevent the coal from pressing against the outer door of the car. The injured person recovered against the coal company, and the coal company successfully brought an action against its insurer to recover its expenses in connection with the stated suit.

In the cited case the exclusion stated [114 F.Supp. 474], "'This policy does

---

5. Definition of Hazards. Division 1. Premises-Operations. The ownership, maintenance or use of the premises and all operations during the policy period which are necessary or incidental thereto.

not apply; (a) Under Division I of the definition of Hazards to * * * vehicles of any kind * * * or the loading or unloading thereof while away from the premises.' "

It is clear in the Youghiogheny case that the policy insured against "hazards" and not "accidents." The court discussed in detail between the two coverages of hazards and accidents. The liability of the insurer is plainly stated to have been because:

"The insuring agreement in the instant case insures against certain hazards, and insofar as the exclusions become applicable, they must exclude hazards, rather than injuries or accidents. Thus, exclusion (a) must be construed to apply to the nature and place of the hazard rather than to the place of an accident or injury. The negligence alleged * * * was in the failure to properly inspect, and in accepting and using a defective freight car. This hazard necessarily arose at the insured premises and as an incident to their use and did not occur at the place of unloading the vehicle while away from the premises."

No comparable provision is found in the present policy. The present policy does not apply to "hazards," but to accidents, and in the present case the exclusion applies to injuries or accidents and does not purport to include hazards. The hazard may have occurred at Pinto, West Virginia, but the accident happened at Emmaus, Pa. I am, therefore, of the opinion that the Youghiogheny case has no close application to the present case.[6]

The third case relied upon by the defendant is Philadelphia Fire & Marine Ins. Co. v. City of Grandview, 42 Wash. 2d 357, 255 P.2d 540, 541. There the City of Grandview piped and sold water to a user. As a result of the city's negligence a highly explosive gas got into the water pipes and the city negligently directed the user to open the faucets so that for two and a half hours the pipes delivered no water but only the explosive gas. The gas exploded, causing damage. The user's insurer sued the city and recovered and garnished the city's insurer. This insurer resisted recovery on an exclusion provision strongly analogous, if not precisely similar, to Item 8 of the instant case. The case, however, in my opinion, has no close application to the present controversy. The court held that the exclusionary clause had no application for several reasons. It was held that the gas was not handled by the city, whereas in the present case the contrary has been held. In the Grandview case it was held that the gas was not embraced within the terms "goods or products" handled by the city and in the present case the tube has been held to be clearly within the term of "goods * * * handled by the insured." I, therefore, am of the opinion that the Grandview case has no close application to the present controversy.

■ I am of the opinion that the accident at Emmaus, Pa. was not within the coverage of the policy.

In the present case there appeared to be present two questions, viz., the liability of the insurer to indemnify the insured for the consequences of the accident happening at Emmaus, Pa., and secondly the duty of the insurer to defend the action brought against the insurer.

A number of cases have held that the duty to defend an action being dependent upon entirely different provisions of the policy is broader than the duty to pay and expressly exists even though the suit is groundless, false or fraudulent. A seeming majority of cases hold that the duty to defend is correlative with

6. The brief of the plaintiff stated that the Youghiogheny case, as herein cited, has been appealed and has not been disposed of on appeal. In view of the distinction herein made rendering the Youghiogheny case inapplicable to the case at bar, it is unnecessary to consider the present state of the case on appeal and its effect.

the insurer's duty to pay the judgment which might be obtained, within the limits of the policy, and that the duty to defend exists only as to actions within the coverage of the policy.

In the present case the parties have agreed that if it be found that the accident at Emmaus, Pa. is not within the coverage of the policy, it shall be found that there was no duty on the insurer to defend the action pending in Philadelphia. Having found that the accident at Emmaus is not within the coverage of the policy, no consideration has been given to the secondary question.

