**C. F. MUELLER COMPANY (a corporation), Plaintiff,**

v.

**MARYLAND CASUALTY COMPANY (a corporation), Defendant.**
**Civ. No. 1084–67.**

United States District Court,
D. New Jersey.
April 11, 1972.

 

John Milton, Jr., Milton, Keane & DeBona, Jersey City, N.J., for plaintiff.

John J. Gaffey, Gaffey, Webb & McDermott, E. Orange, N.J., for defendant.

## OPINION

SHAW, District Judge.

This action arises out of a robbery which occurred at the C. F. Mueller Company (Mueller) plant in Jersey City on February 2, 1967. Plaintiff, Mueller, brings the action against defendant insurance carrier (Maryland) to recover its loss pursuant to the provisions of a policy of insurance issued by defendant. The policy of insurance is known as Paymasters Broad Form Coverage Policy which insured plaintiff for loss of payroll funds by the actual destruction, disappearance or wrongful abstraction thereof within the Mueller premises. The policy defines payroll funds as follows:

> "Payroll funds" means money and securities intended solely for the payroll of the insured.

The policy also defines the words "money" and "securities":

> "Money" means currency, coins, bank notes and bullion; and travelers checks, register checks and money orders held for sale to the public.

> "Securities" means all negotiable and non-negotiable instruments or contracts representing either money or other property and includes revenue and other stamps in current use, tokens and tickets, but does not include money.

The sole issue presented for determination by the Court is whether the money taken from the Mueller plant on February 2, 1967, was a payroll fund within the definition contained in the policy.

Upon trial to the Court without a jury the following pertinent facts emerge:

On February 2, 1967, at approximately 2:00 p. m. a man entered the Mueller plant and stated to the receptionist that he was a Mr. Martin from the Internal Revenue Service. When his presence was announced, plaintiff's secretary-treasurer, Mr. Post, met him. The president of Mueller, Mr. Toner, for whom Mr. Martin had inquired was absent. Martin began talking in a loud voice and Mr. Post invited him to his office because he did not .want others to hear what Martin had to say with respect to plaintiff's tax liability. Once inside the office, Martin removed a gun from his attache case and threatened to kill Mr. Post if he did not do exactly what Martin told him to do. Post closed the office door and told his secretary that he would receive no calls. Martin then asked Post for a bank statement of the Mueller Company covering the previous month. Post called his assistant, Mr. Geils, on the telephone and asked him to bring the statement into his office. Martin kept the gun concealed when the bank statement was brought into the office. After looking at the statement, Martin told Post to draw a check in the sum of $24,640 to the order of cash. Mr. Post advised Martin that such a check could not be drawn on the First National Bank of Jersey City because such a check would have to be signed by either Mr. Toner or Mr. Mueller, both of whom were absent.

Martin then said he wanted a check drawn on another bank in Jersey City in the same amount. Post then called Geils and told him to draw a check to cash in the amount of $24,640 on the Commercial Trust Company in Jersey City and that he would explain the reason at some later time. Pursuant to Post's request, Geils produced a check for the amount requested with his own signature on it and put it on the desk and left. Post then signed the check as instructed. Martin then compared the signature on this check with those on cancelled checks

of plaintiff which Martin had before him.

After the check had been signed, Martin instructed Post to call the Commercial Trust Company, ask for the president, and tell him that he wanted money and that he was sending a check over for $24,640. Post made the call while Martin listened in on another telephone. Post spoke to a Mr. Duffy, an officer of Commercial Trust Company at the Grove Street Branch, saying, "We have an emergency. We need money for payroll funds. I am sending over a messenger with a check to receive payroll money." Since the Trust Company did not have its armored car available at that time, Mr. Duffy requested Post to send his messenger who could pick up the money. Post made these arrangements while still under gunpoint. Each time anyone came into the office Martin concealed his gun in his attache case, keeping his hand in the case on the gun. Mr. Duffy from the bank arranged in the meantime for a police escort for the messenger to bring the money back to the plant. The messenger returned with the money. Martin placed it in his attache case. Martin then compelled Post to borrow Geils' car and leave the plant with him. He then ordered Post to get behind the wheel and drive away. They drove to an empty lot in the rear of a plant in the Greenville section of Jersey City where Martin made Post get into the trunk and then drove the car himself to a parking lot below the Jersey City Medical Center where he left Post in the trunk and made off with the money. Subsequently Martin telephoned Geils at the plant and advised him that Post was in the trunk of the car in the lot.

First it should be noted that neither proof of loss nor the amount of loss is in dispute. Post admitted on cross-examination that when he told Mr. Duffy the money was needed for an emergency payroll, it was not the truth. According to Post, he made the statement that he needed payroll money because it was the only money he could think of that the bank would ever send over in cash.

The proofs established that Mueller had four bank accounts. Two were at Jersey City banks, one in a New York bank, and the other in a Newark bank. The bank account which plaintiff maintained at First National Bank of Jersey City was a depository account into which all accounts receivable were placed. From this account monies were transferred to the other accounts as the needs of the company required. From the account at Commercial Trust Company in Jersey City all cash payrolls were paid. The money on deposit there was also available for payment of other expenses of the Mueller business. Post admitted on cross-examination that money on deposit with Commercial Trust Company could be withdrawn by way of checks to pay taxes, operating expenses and other business expenses.

A statement made by Mr. Post four days after the robbery to a representative of defendant was admitted into evidence. The eight page statement was transcribed by the insurance company representative to record Mr. Post's answers to questions propounded to him. Post signed each page of the statement and above his signature on the last page is the statement, "The above statement of 8 pages is true and correct." On the last page of the statement the following appears:

. . . Commercial Trust Co. account is also used for operating expenses. It is all one balance. *There is no special allocation for payroll nor for expenses.* (Emphasis supplied)

The following colloquy between the Court and Mr. Post demonstrates that no part of the funds in the Commercial Trust Company were earmarked solely for payroll purposes:

THE COURT: Was any action taken by C. F. Muller and Co. in respect to this account to earmark the funds in that account solely for payroll purposes?

THE WITNESS: I would say, your Honor, only through use, that it was

always used for payroll and no other bank was used for cash disbursements.

THE COURT: Was there anything in the manner in which the account was set up which restricted the funds to use for payroll purposes? To put it another way could C. F. Muller draw on this account for any purposes it chose?

THE WITNESS: We could pay any bills.

Moreover, the corporate resolutions of Mueller on the Commercial Trust account contain no restrictions of disbursements out of the Commercial Trust Company account which earmarked funds on deposit solely for payroll purposes. A further colloquy between the Court and Mr. Post is informative:

THE COURT: Mr. Post, do you have knowledge of anything in your corporate records which restricted withdrawals from the Commercial Trust account to certain specific purposes?

THE WITNESS: I know of no restriction in the corporate record.

THE COURT: Am I correct in assuming that as far as your corporate regulations, resolutions and so forth, are concerned, there was nothing at any time preventing a properly authorized officer or officers of Muller from withdrawing funds from the Commercial Trust for the purpose of paying any business obligation?

THE WITNESS: That is correct.

An analysis of the account at Commercial Trust Company for the years 1966 and 1967 prepared by Mr. Post at the request of counsel for Mueller reveals that the cash payrolls were 14.8% of all disbursements from the Commercial Trust Company account for those years.

The average weekly payroll of Mueller was between $35,000 and $45,000 and the average weekly balance in the Commercial Trust Company account was about $250,000. As of February 2, 1967, (the day of the robbery) there was available for the purpose of drawing checks a balance of $393,934.

The procedure for payrolls was that the head of the payroll department prepared the same; they were summarized and the net amount of cash needed was computed and denominated. A call would then be put through to the bank giving the total amount of the payroll and the denominations. The payroll department would submit a request for a check to the accounts payable department which department would draw a check in the amount requested. This check would be returned to the payroll department and it would be delivered to an armored truck guard when he delivered the payroll money. Mr. Post testified that it was not within the scope of his assigned duties to prepare a cash payroll and that he was never required during 1967 to do so.

The Court inquired as to why Mueller maintained a weekly balance in the Commercial Trust Company account so far in excess of any need for weekly payrolls. The answer given by Mr. Post was, "We kept a minimum balance in all our accounts that had no relationship to the need for that day," (referring to the maximum weekly payroll of $35,000 to $45,000.)

Plaintiff cites Chein & Co. v. Royal Indemnity Co., 132 N.J.L. 338, 40 A.2d 608 (E & A 1945). This case is analogous neither in point of fact nor law. In *Chein* payroll money had actually been delivered to the insured's premises and it was taken by robbers who compelled an employee to open a safe where the money had been placed to await later distribution for payroll purposes. There seems to have been no question that the money stolen was intended for use as payroll money. Because of a breach of a condition of the insurance policy (failure to have an armed guard on the premises), judgment was entered in favor of the insurance carrier. Plaintiff can find no comfort in *Chein* as authority in the instant case.

The case of International Harvester Co. v. National Surety Co., 44 F.2d 746 (7th Cir. 1930), reversing the district

court, cert. denied 282 U.S. 895, 51 S.Ct. 179, 75 L.Ed. 788, involved a policy of payroll insurance coverage in which the pertinent provisions read as follows:

> For direct loss by robbery of money, intended for payrolls only, from the care or custody of any employee of the assured, while acting as a messenger or paymaster, and while receiving, handling, conveying and distributing the same, to and from and within such place or places as may be directed by the assured, and described in Statement No. 3 of the Schedule.

The payroll money had been delivered to the insured's premises and was in a chest in a locked conference room where it had been placed by Brink's Express Company. While there it was taken by robbery. The court held in *International Harvester* that the funds delivered in a chest and placed in the conference room by Brink's Express Company had been separated for payroll purposes at the time the chest was placed in the conference room and that loss was covered by the payroll insurance coverage. The following language in *International Harvester* is noted:

> We are of the opinion that the word "handling", as used in the policy, is broad and comprehensive enough to cover the money intended for the pay roll *from the time it was separated for that purpose* until received by the employees. At p. 750 (Emphasis supplied)

■ The pertinent language of the policy of insurance describing the coverage afforded and the definition of "payroll funds" is clear and unambiguous and the policy must be enforced as it is written. The robbery did occur within the premises but the money taken could be considered as "payroll funds" only if the Court were to indulge in the fiction that the money stolen had been brought to the premises of Mueller for payroll purposes. This would be pure fiction which in this instance could not be used to broaden the coverage which the insurance carrier undertook to furnish.

■ "The term 'pay roll' as used in a robbery policy means a *fund or sum or money on hand in cash for disbursement to pay wages at a designated time and place.*" (Emphasis supplied) Insurance Law and Practice, Appleman 5 § 3180, citing Mac Gruer v. Fidelity and Casualty Co. of N. Y., 89 Cal.App. 227, 264 P. 501 at page 502 (1928). Of course, any general definition of "payroll funds" is academic since the policy in question defines "payroll funds" and it is the policy definition which is controlling. In this instance the funds would be money "intended solely for the payroll of the insured."

The robbery occurred within the premises designated by the policy, but the money taken was not money separated from a general fund and specifically earmarked for payroll. None of the normal operating procedures of Mueller to obtain cash payroll were observed in the instant case. It was the function of the payroll department to prepare the payroll and to present the payroll check to an armored car guard. Ordinarily that check would be prepared by the accounts payable department and not by Mr. Post.

The argument that funds transferred from the First National Bank of Jersey City to the Commercial Trust account had the effect of designation of such funds in the Commercial Trust account for payroll purposes is not persuasive. There was no restriction limiting withdrawals to funds intended solely for payroll purposes. Moreover, application of this theory would bring the entire deposit in Commercial Trust within the category of a payroll fund covered by the policy of insurance. Obviously it was not the intent of the insurance carrier by its contract of insurance to insure against robbery of the bank account. The restriction upon coverage to a robbery "within the premises" of Mueller clearly negates any such conclusion. The only logical construction which can be given to the definition of payroll funds as it appears in the policy is that such funds were those specifically allocated in cash for purposes of a

prepared payroll and "intended solely for the payroll of the insured." The funds in question do not meet the test.

 The burden of proof rests upon plaintiff to establish whether the loss it sustained was in fact within the insurance coverage afforded. Trad Television Corp. v. Hartford Indemnity Co., 35 N.J.Super. 36, 113 A.2d 47 (App.Div. 1955). Plaintiff has failed to sustain the burden of proof cast upon it.

Accordingly, judgment will be entered in favor of defendant and against plaintiff with prejudice and without costs.

An appropriate order for entry of judgment will be submitted.